**Gregory R. Bockin** (*pending pro hac vice*)
**Samantha M. Williams** (*pending pro hac vice*)
**Jacqueline M. O'Reilly** (*pending pro hac vice*)
**S. Yael Berger** (*pending pro hac vice*)
**Attorneys for Plaintiff**
**U.S. SECURITIES AND EXCHANGE COMMISSION**
**100 F Street, NE**
**Washington, DC 20549**
**Phone:  (202) 551-5684 (Bockin)**
**Email: bocking@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION** | : <br> : <br> : |
| **Plaintiff,** | :    **Civil Action No.** <br> : <br> :    **Jury Trial Demanded** |
| **vs.** | : <br> : |
| **JOVANNIE AQUINO** | : <br> : |
| **Defendant.** | : <br> : <br> : |

_____

## COMPLAINT

Plaintiff United States Securities and Exchange Commission, for its Complaint against Defendant Emil Aquino alleges as follows:

## SUMMARY

1.      From December 2015 to November 2017, Aquino, then a registered representative at a broker-dealer based in New York City, engaged in a fraud involving excessive trading in the accounts of his retail customers that generated substantial commissions to enrich himself while his customers experienced significant losses.

2.     Aquino persuaded at least seven customers to maintain securities trading accounts with him at the firm and assured them that he would employ a profitable trading strategy on their behalf.  Aquino recommended a series of frequent, short-term trades to these customers while charging them costly commissions and fees for each trade.  The frequency of Aquino's trading, coupled with the commissions and fees on every trade, made it almost certain that his customers would lose money from the recommended level of trading.  Indeed, the customers' investments would need to achieve annual returns of approximately 21% to 406% just to pay for the transaction costs associated with Aquino's trading strategy.

3.     Aquino was required to have a reasonable basis to believe his trading strategy was suitable for the customers to whom he recommended it.  In fact, Aquino did not have a reasonable basis to believe that the frequent level of trading he recommended to customers, given the significant costs imposed on them, would be suitable for them or anyone else. Additionally, Aquino recommended a level of trading that was unsuitable to six customers, in light of those customers' financial needs, investment objectives, risk tolerance, and other circumstances.  Aquino also engaged in fraudulent and deceptive conduct by executing certain trades in customers' accounts without first obtaining their approval or informing them of material facts about the trading strategy he recommended, as required for non-discretionary accounts.

4.     Aquino violated the antifraud provisions of the federal securities laws by:  (a) recommending an investment strategy to his customers without a reasonable basis to believe it was suitable for those investors; (b) recommending an investment strategy that was unsuitable for certain of his customers in light of those customers' financial needs, investment objectives, and circumstances; (c) making materially false and misleading statements to customers regarding

the strategy; and (d) engaging in unauthorized trading.

5.     Aquino's fraudulent acts and omissions resulted in approximately $881,000 in losses for the customers and $935,000 in ill-gotten gains for Aquino.

## VIOLATIONS

6.     By engaging in the conduct alleged herein, the Defendant, directly or indirectly, violated, and unless restrained and enjoined will violate again, Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## JURISDICTION AND VENUE

7.     The Commission brings this action pursuant to authority conferred by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], seeking a final judgment: (1) restraining and permanently enjoining the Defendant from engaging in the acts, practices and courses of business alleged against him herein; (b) ordering the Defendant to disgorge all ill-gotten gains and to pay prejudgment interest on those amounts; and (c) imposing civil money penalties on the Defendant pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

8.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Section 22(a) of Securities Act [15 U.S.C. § 77v(a)], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].  The Defendant, either directly or indirectly, has made use of the means or instrumentalities of interstate commerce, of the mails, of the facilities of national securities exchanges, and/or the means or instruments of transportation or communication in interstate commerce in connection with the acts, practices, and courses of

business alleged herein.

9.      Venue lies in the Southern District of New York pursuant to 28 U.S.C.

§1391(b)(2), Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Section 27 of the

Exchange Act [15 U.S.C. § 78aa].  Aquino lives and works within the District and many of the

offers and sales of securities and acts, practices, transactions, and courses of business alleged in

this complaint occurred within the Southern District of New York.  Specifically, Aquino's

violations took place while he was acting as a registered representative associated with Meyers

Associates, LP, a broker-dealer located in New York City, commission payments from Meyers to

Aquino were initiated in the Southern District of New York, trades were initiated through

Meyer's trading desk in the Southern District of New York, and trades were executed on

exchanges based in the Southern District of New York, and were effected, directly or indirectly,

by making use of means or instrumentalities of transportation or communication in interstate

commerce, or the mails, or the facilities of national securities exchange.

## DEFENDANT

10.      **Aquino**, age 37, a resident of the Bronx, New York, worked as a registered

representative associated with Meyers Associates, LP (later known as Windsor Street Capital,

LP) from May 2014 through November 2017.  Since 2004 to the present, Aquino has worked for

twelve different brokerage firms and holds Series 7 and 63 licenses.

## RELATED ENTITY

11.      **Meyers Associates, L.P. ("Meyers")**, a New York limited partnership with its

principal place of business in New York, New York, has been registered with the Commission as

a broker-dealer since 1993.  In December 2016, Meyers changed its name to Windsor Street

Capital, LP.  In May 2018, FINRA expelled Meyers from FINRA membership, and consequently

4

the securities industry, after Meyers failed to comply with the terms of a prior SEC Order, SEC Rel. No. 33-10392 (July 28, 2017).

## FACTS

12.    From December 2015 to November 2017, Aquino defrauded at least seven customers by recommending an investment strategy that, due to the substantial commissions he charged, was certain to cause them to lose money unless his trading earned highly improbable gains.

13.    In 2015 and 2016, Aquino and a colleague cold-called potential customers using leads from a publicly-available databases to solicit them to open securities trading accounts at Meyers.

14.    Customers 1 through 7 opened accounts at Meyers in their names on or around the following dates:

| Customer | Account Opening Date |
|----------|---------------------|
| Customer 1 | 08/27/2015 |
| Customers 2 and 3 | 11/14/2016 |
| Customer 4 | 10/18/2016 |
| Customers 5 and 6 | 12/10/2015 |
| Customer 5 IRA | 12/16/2015 |
| Customer 5 ROTH IRA | 12/16/2015 |
| Customer 6 IRA | 12/16/2015 |
| Customer 6 ROTH IRA | 12/16/2015 |
| Customer 7 | 05/20/2016 |

Aquino directed the accounts to be opened for Customers 2 through 6.  Customers 1 and 7

initially opened the account with other registered representatives, but Aquino subsequently

became the registered representatives on these accounts.

**Aquino's Recommendation of Frequent, Short-Term Trading**

15.    For each of Customers 1 through 7, Aquino recommended a series of short-term

investments involving frequent purchases and sales of securities, sometimes referred to as "in-

and-out" trading.   During the dates specified below, Aquino employed this strategy with the

money invested by Customers 1 through 7:

| Customer | Trading Dates |
|---|---|
| Customer 1 | 10/18/2016 – 05/11/2017 |
| Customers 2 and 3 | 11/21/2016 – 10/19/2017 |
| Customer 4 | 10/18/2016 – 11/10/2017 |
| Customers 5 and 6 | 12/10/2015 – 02/03/2017 |
| Customer 5 IRA | 12/29/2015 – 01/03/2017 |
| Customer 5 ROTH IRA | 12/30/2015 – 12/08/2016 |
| Customer 6 IRA | 12/29/2015 – 01/03/2017 |
| Customer 6 ROTH IRA | 12/30/2015 – 11/28/2016 |
| Customer 7 | 10/31/2016 – 10/30/2017 |

16.    Aquino charged Customers 1 through 7 commissions or markups/markdowns and

other fees on a trade-by-trade basis.   Because the customers incurred costs with every

transaction, making a profit depended upon the price of the security increasing during the brief

period that the security was held in the customer's account.

17.    Aquino charged Customers 1 through 7 commissions and fees on losing trades as

well as profitable trades.   Aquino personally set the amount of the commissions and received

between 55% and 75% of the commissions that he generated for Meyers.

18.     Aquino caused Customers 1 through 7 to hold each of the securities that he recommended they purchase for an average of 15.9 days before selling.

19.     Turnover and cost-to-equity ratios are industry metrics used to measure whether activity in brokerage accounts is excessive.  Turnover is the number of times per year a customer's securities are replaced by new securities.  The cost-to-equity ratio, also referred to as the break-even ratio, measures the amount the value of the securities in an account has to appreciate annually just to cover trading costs.  An annual turnover of 6 or more, or a cost-to-equity ratio of 20% or more, are generally considered to be indicators of excessive trading.

20.     During the relevant period, the annualized turnover and cost-to-equity ratios for the accounts that Aquino managed for Customers 1 through 7 were extremely high and indicative of excessive trading.  Customer 1 had a cost-to-equity ratio of 406.5% and an annualized turnover rate of 63.7.  Customers 2 and 3 had a joint account, with a cost-to-equity ratio of 67.8% and an annualized turnover rate of 16.2.  Customer 4 had a cost-to-equity ratio of 92.2% and an annualized turnover rate of 39.3.  Customers 5 and 6 had a joint account, with a cost-to-equity ratio of 97.5% and an annualized turnover rate of 32.9.  Customer 5 also had two retirement accounts, with cost-to-equity ratios of 39.2% and 22.3%, and annualized turnover of 12.3 and 9.9.  Customer 6 also had two retirement accounts, with cost-to-equity ratios of 36.5% and 21.5%, and annualized turnover of 10.5 and 10.4.  Customer 7 had a cost-to-equity ratio of 103.0% and an annualized turnover rate of 38.9.

21.     The average annualized cost-to-equity ratio for Aquino's seven customers was 87.0%.  In other words, due to the significant costs associated with the trading strategy Aquino recommended, the securities in his customers' accounts had to increase in value by an average of

87.0% a year, just for the customer to realize a single dollar of profit.

22.     Due to Aquino's recommended trading strategy, Customers 1 through 7 paid a total of approximately $1.4 million in commissions, mark-ups, mark-downs, and other trading costs during the brief period their accounts were open.  As reflected in the chart below, which includes the turnover and cost-to-equity figures for their accounts, Customers 1 through 7 each lost tens of thousands, and in some cases, hundreds of thousands, of dollars as a result of Aquino's recommended trading strategy:

| | Account / Customer | Account Analysis Time Period | Gain (Loss) | Annual Cost / Equity Ratio | Annual Equity Turnover | Average Equity | Total Costs |
|---|---|---|---|---|---|---|---|
| 1 | Customer 1 | 10/01/2016 – 05/31/2017 | ($34,011) | 406.5% | 63.7 | $20,872 | $56,251 |
| 2 | Customers 2 and 3 | 11/01/2016 – 10/31/2017 | ($73,516) | 67.8% | 16.2 | $110,055 | $74,415 |
| 3 | Customer 4 | 10/01/2016 – 11/30/2017 | ($86,780) | 92.2% | 39.3 | $29,296 | $31,445 |
| 4 | Customers 5 and 6 Joint | 12/01/2015 – 02/28/2017 | ($491,548) | 97.5% | 32.9 | $933,347 | $1,134,622 |
| 5 | Customer 5 IRA | 12/01/2015 – 02/28/2017 | ($30,431) | 39.2% | 12.3 | $107,190 | $52,330 |
| 6 | Customer 5 Roth IRA | 12/01/2015 – 02/28/2017 | ($2,340) | 22.3% | 9.9 | $14,031 | $3,906 |
| 7 | Customer 6 IRA | 12/01/2015 – 02/28/2017 | ($28,349) | 36.5% | 10.5 | $106,396 | $48,457 |
| 8 | Customer 6 Roth IRA | 12/01/2015 – 02/28/2017 | ($1,065) | 21.5% | 10.4 | $16,997 | $4,558 |
| 9 | Customer 7 | 10/01/2016 – 11/30/2017 | ($133,582) | 103.0% | 38.9 | $27,853 | $33,414 |
| | **ACROSS ACCOUNTS** | **12/01/2015 – 11/30/2017** | **($881,622)** | **87.0%** | **28.3** | **$827,474** | **$1,439,397** |

**Aquino Had a Duty to Have a Reasonable Basis for Recommended Trading**

23.    Aquino owed a duty to his customers to have a reasonable basis for any investment strategy he recommended.  This meant that, at a minimum, he needed to understand whether the costs associated with his strategy would exceed any potential investment gains.

24.    Meyers's policies and procedures, which were in effect during the relevant period and applied to Aquino, described this obligation:  "[Registered Representatives] must have a reasonable basis for believing that a recommended transaction or investment strategy involving a security or securities is suitable for the customer."   Aquino personally received Meyers's procedures.

**Aquino Made Recommendations With No Reasonable Basis**

25.    As alleged above, Aquino was required to have a reasonable basis to believe that his trading strategy was suitable for the customers to whom he recommended it.  Before making any recommendations to customers, he was required to take steps to ensure that he understood the potential risks and rewards of any trading recommendation.

26.    Aquino did not take reasonable steps to determine whether his recommended in-and-out trading strategy was suitable for Customers 1 through 7, given the associated high trading costs.

27.    Since the customers incurred trading costs with every transaction, making a profit depended upon the price of the security increasing during the brief period the security was held in the customer accounts.  The increase in price had to exceed the combined costs for even a minimal profit to be realized.  The impact of the costs associated with the excessive trading, however, made it virtually certain that customers would not earn even a minimal profit.

**Aquino Recommended Unsuitable Trades to Customers**

28.     Aquino also had a duty to determine that his trading recommendations were suitable for each of his customers in light of their financial needs, investment objectives, risk tolerance, and other circumstances.

29.     Despite this duty, Aquino had only limited discussions with Customers 2 through 7 regarding their financial conditions and needs.  Most of the Meyers account opening documents sent to these customers did not call for each customer to specify his or her investment objective; instead, they were pre-populated to reflect "speculation" as the objective.

30.     Aquino recommended a trading strategy to Customers 2, 3, 4, 5, 6, and 7 that was not suitable for them and was incompatible with their individual financial needs, investment objectives, risk tolerances, and other circumstances, particularly in light of the high costs associated with the trading.

31.     For example, Customers 2 and 3 were 65 and 72 when they opened their accounts with Meyers.  At that time, Customer 2 was an accountant and Customer 3 was a retired teacher and choral director.  Customers 2 and 3 told Aquino that they did not have a lot of money and did not want to lose money.  Customers 2 and 3 also told Aquino that their investment objective was "growth."  Aquino's high cost, frequent trading strategy, which was virtually certain to lose money, was not suitable for these customers' expressed investment strategy of growth and their desire to preserve their assets.

32.     Customer 4 was over 70 when he opened his account with Meyers and earned less than $200,000 a year from his small business.  Customer 4 indicated in his account opening documents that his risk objective was "maximum growth."  Aquino's high cost, frequent trading strategy, which was virtually certain  to lose money, was not suitable for this customer's

expressed investment objective of "maximum growth."

33.     Customers 5 and 6, who were near retirement age when they opened their accounts, told Aquino that they wanted to invest their assets with a goal of retiring in a few years.  Customer 5 is a farmer married to Customer 6, who is a homemaker; their combined annual income was under $200,000.  However, due to the level of trading Aquino recommended, Customers 5 and 6 paid over $1.2 million in commissions and fees during the 15 months their accounts were open.  Aquino's high cost, frequent trading strategy, which was virtually certain to lose money, was not suitable for these customers' investment objective of preserving their assets in order to retire in a few years.

34.     Customer 7 was over 80 when he opened his account with Aquino, and worked as a logger.  His annual income is $30-40,000 per year, plus social security benefits.  Customer 7 also indicated an investment objective of "growth and income" on his account opening documents. Aquino's high cost, frequent trading strategy, which was virtually certain to lose money, was not suitable for this customer's expressed investment objective of "growth and income."

35.     Aquino knew or was reckless in not knowing that his recommendation of a high-cost, frequent, short-term trading strategy was unsuitable for Customers 2, 3, 4, 5, 6, and 7 in light of their financial needs, investment objectives, risk tolerance, and other circumstances.

**Aquino Made Materially False and Misleading Statements to Customers**

36.     In communications with Customers 1 through 7 about their accounts, Aquino represented to each of them that his trading strategy would be profitable.

37.     In addition, because Aquino had an obligation to ensure that trades he recommended were suitable for the customer, he implicitly represented that he had a reasonable

basis for the trading strategy when he recommended it to Customers 1 through 7, and that it was suitable for each customer given their specific financial needs, investment objectives, risk tolerance, and other circumstances.

38.     Both Aquino's explicit and implicit representations to Customers 1 through 7 were false because, given the high trading costs and accompanying low likelihood of profitability, Aquino's strategy was highly unlikely to be profitable and was not suitable for any investor.

39.     Aquino knew or was reckless in not knowing that generating even a minimal profit from his trading strategy depended on price increases of the stocks greater than the trading fees that he was charging the customers.  Since the investments he recommended to Customers 1 through 7 were held on average for 15.9 days before being sold, any price increases were almost always negated by the associated transaction costs of buying and selling the securities.  Indeed, the customers' investments would have had to achieve annual returns of approximately 21% to 406% just to cover the trading costs associated with Aquino's recommendation.

40.     Aquino also knew or was reckless in not knowing that the level of trading he recommended to Customers 2 through 7 was not suitable for them in light of the customers' financial needs, investment objectives, and circumstances, due to the near certainty that it would be unprofitable because of its associated high trading fees.

41.     Aquino's false and misleading statements were material.  The profitability of a recommended trading strategy is a matter of importance to a reasonable investor.

**Aquino Acted with Scienter**

42.     Aquino knew or was reckless in not knowing that the series of frequent trades and level of trading he recommended was unsuitable for Customers 1 through 7 because their

transaction costs were virtually certain to exceed profits.

43.     Aquino personally benefitted when he recommended his unsuitable trading strategy to Customers 1 through 7 because he reaped large profits from the trading costs charged on a trade-by-trade basis, while his customers suffered significant losses.  The more frequently these customers traded, the more profits Aquino acquired.  During the period from December 2015 to November 2017, Aquino personally obtained at least $935,000 in compensation from the commissions and other costs he charged Customers 1 through 7 for the unsuitable trading he recommended.

44.     In addition, Aquino's scienter is evidenced by steps he took to conceal significant transaction costs associated with his recommended level of trading.  As described below, Aquino did this by charging larger trading costs in circumstances where the trading costs would not be obvious to the customer.

45.     When a brokerage firm acts as an agent for a securities trade, *i.e.*, brokers the transaction between its customer and a third party, the trading cost is generally a commission calculated as a percentage of the value of the securities traded.  When a brokerage firm acts as a principal for a securities trade, *i.e.*, transacts with its customer with securities from the firm's own inventory, the trading cost is generally a mark-up (for a purchase) or a mark-down (for a sale) to the price of the security being traded.

46.     Meyers sent Customers 1 through 7 trade confirmations containing details of their trades.  Trade confirmations for agency trades reflected the total amount of the commission charged as a separate line item.  Trade confirmations for principal trades, however, reflected mark-ups or mark-downs on a per share basis; to determine the total cost of executing the trade, the customer would need to complete an additional calculation.

47.     Aquino determined, on a trade-by-trade basis, whether to execute the trade on an agency or principal basis and the amount to charge the customer in commission, mark-up, or mark-down.  For example, Aquino charged Customers 5 and 6 larger transaction costs in their joint account when common stock trades were executed on a principal basis and total costs were less obvious, than he did in commissions on common stock agency trades.

**Aquino Engaged in Unauthorized Trading**

48.     Aquino also engaged in deceptive conduct by trading on behalf of certain customers without obtaining their approval or informing them of material facts about the trading such as what securities he was purchasing or selling and in what quantities.

49.     All of the accounts managed by Aquino were non-discretionary, meaning that Aquino was required to obtain customer authorization prior to each transaction.

50.     Aquino obtained customer authorizations for trades through phone calls with his customers.  As a result, a phone call between the customer and Aquino needed to occur before any trade.

51.     Telephone and trading records reflect a number of instances where Aquino did not call Customers 1 through 7 prior to executing trades for their accounts.  Upon information and belief, these trades were unauthorized.

52.     The chart below illustrates examples of dates where, upon information and belief, unauthorized trading occurred for Customers 1 through 7.

| Customer | Date | Number of Trades |
|---|---|---|
| Customer 1 | 12/5/2016 | 2 |
| | 12/7/2016 | 2 |
| | 12/8/2016 | 3 |
| | 12/9/2016 | 3 |
| | 12/15/2016 | 5 |
| | 12/16/2016 | 4 |
| | 12/19/2016 | 4 |

| Customer | Date | Number of Trades |
|---|---|---|
| | 12/20/2016 | 4 |
| | 12/21/2016 | 3 |
| | 12/22/2016 | 4 |
| | 12/29/2016 | 1 |
| | 1/3/2017 | 1 |
| | 1/13/2017 | 1 |
| | 1/14/2017 | 1 |
| | 1/17/2017 | 1 |
| | 1/20/2017 | 4 |
| | 1/25/2017 | 3 |
| | 1/27/2017 | 1 |
| | 2/15/2017 | 1 |
| | 3/3/2017 | 2 |
| | 4/10/2017 | 1 |
| | 5/3/2017 | 2 |
| | 5/10/2017 | 2 |
| | 5/11/2017 | 2 |
| Customers 2 and 3 | 2/23/2017 | 5 |
| | 4/10/2017 | 1 |
| | 4/11/2017 | 1 |
| | 4/26/2017 | 4 |
| | 5/11/2017 | 4 |
| | 5/12/2017 | 4 |
| | 8/10/2017 | 2 |
| | 8/14/2017 | 3 |
| | 8/16/2017 | 3 |
| | 9/14/2017 | 4 |
| | 10/16/2017 | 6 |
| | 10/19/2017 | 2 |
| Customer 4 | 11/17/2016 | 2 |
| | 11/29/2016 | 1 |
| | 12/8/2016 | 1 |
| | 12/19/2016 | 1 |
| | 12/29/2016 | 1 |
| | 2/1/2017 | 1 |
| | 2/7/2017 | 1 |
| | 2/16/2017 | 2 |
| | 2/28/2017 | 3 |
| | 3/1/2017 | 2 |
| | 3/2/2017 | 3 |
| | 3/10/2017 | 1 |
| | 3/14/2017 | 1 |
| | 3/15/2017 | 3 |
| | 3/28/2017 | 2 |

| Customer | Date | Number of Trades |
|---|---|---|
| | 3/29/2017 | 2 |
| | 3/30/2017 | 2 |
| | 3/31/2017 | 2 |
| | 4/6/2017 | 5 |
| | 4/7/2017 | 2 |
| | 4/10/2017 | 2 |
| | 4/11/2017 | 1 |
| | 4/17/2017 | 1 |
| | 4/19/2017 | 4 |
| | 4/20/2017 | 1 |
| | 4/24/2017 | 1 |
| | 11/2/2017 | 3 |
| | 11/3/2017 | 3 |
| | 11/10/2017 | 1 |
| Customers 5 and 6 Joint | 4/22/2016 | 2 |
| | 4/28/2016 | 9 |
| | 4/29/2016 | 8 |
| | 5/16/2016 | 1 |
| | 5/20/2016 | 2 |
| | 5/25/2016 | 1 |
| | 5/26/2016 | 1 |
| | 5/27/2016 | 5 |
| | 5/31/2016 | 2 |
| | 6/1/2016 | 1 |
| | 6/3/2016 | 1 |
| | 6/6/2016 | 5 |
| | 6/9/2016 | 3 |
| | 6/10/2016 | 1 |
| | 6/13/2016 | 4 |
| | 6/16/2016 | 1 |
| | 7/1/2016 | 1 |
| | 7/22/2016 | 4 |
| | 7/25/2016 | 4 |
| | 7/26/2016 | 8 |
| | 7/27/2016 | 8 |
| | 7/28/2016 | 6 |
| | 7/29/2016 | 3 |
| | 8/4/2016 | 3 |
| | 8/5/2016 | 3 |
| | 8/11/2016 | 1 |
| | 8/23/2016 | 1 |
| | 9/29/2016 | 5 |
| | 9/30/2016 | 1 |
| | 10/3/2016 | 1 |

| Customer | Date | Number of Trades |
|---|---|---|
| | 10/7/2016 | 1 |
| | 10/20/2016 | 3 |
| | 10/25/2016 | 3 |
| | 10/26/2016 | 2 |
| | 10/27/2016 | 3 |
| | 10/31/2016 | 10 |
| | 11/2/2016 | 1 |
| | 11/11/2016 | 3 |
| | 11/21/2016 | 3 |
| | 11/22/2016 | 7 |
| | 11/25/2016 | 3 |
| | 12/1/2016 | 18 |
| | 12/2/2016 | 2 |
| | 12/5/2016 | 5 |
| | 12/12/2016 | 8 |
| | 12/13/2016 | 5 |
| | 12/14/2016 | 5 |
| | 12/15/2016 | 7 |
| | 12/16/2016 | 9 |
| | 12/21/2016 | 5 |
| | 12/22/2016 | 10 |
| | 1/3/2017 | 10 |
| | 1/9/2017 | 2 |
| | 1/10/2017 | 7 |
| | 1/11/2017 | 4 |
| | 1/12/2017 | 8 |
| | 1/13/2017 | 6 |
| | 1/14/2017 | 1 |
| | 1/17/2017 | 1 |
| | 1/18/2017 | 14 |
| | 1/19/2017 | 11 |
| | 1/20/2017 | 7 |
| | 1/23/2017 | 12 |
| | 1/24/2017 | 12 |
| | 1/25/2017 | 28 |
| | 1/26/2017 | 20 |
| | 1/27/2017 | 4 |
| | 1/30/2017 | 3 |
| | 1/31/2017 | 4 |
| | 2/1/2017 | 5 |
| Customer 5 IRA | 5/16/2016 | 4 |
| | 5/31/2016 | 7 |
| | 6/6/2016 | 1 |
| | 6/9/2016 | 3 |

| Customer | Date | Number of Trades |
|---|---|---|
| | 6/10/2016 | 2 |
| | 6/17/2016 | 1 |
| | 6/27/2016 | 2 |
| | 7/8/2016 | 1 |
| | 7/25/2016 | 1 |
| | 7/29/2016 | 1 |
| | 8/3/2016 | 2 |
| | 8/5/2016 | 1 |
| | 8/11/2016 | 4 |
| | 8/22/2016 | 2 |
| | 9/6/2016 | 1 |
| | 9/15/2016 | 1 |
| | 10/25/2016 | 1 |
| | 10/26/2016 | 2 |
| | 10/27/2016 | 3 |
| | 10/28/2016 | 1 |
| | 11/21/2016 | 1 |
| | 11/25/2016 | 3 |
| | 1/3/2017 | 5 |
| Customer 5 Roth IRA | 4/27/2016 | 2 |
| | 6/9/2016 | 2 |
| | 8/3/2016 | 1 |
| | 8/11/2016 | 1 |
| | 10/27/2016 | 2 |
| | 10/31/2016 | 2 |
| | 11/25/2016 | 1 |
| Customer 6 IRA | 5/16/2016 | 4 |
| | 5/31/2016 | 7 |
| | 6/6/2016 | 1 |
| | 6/9/2016 | 3 |
| | 6/10/2016 | 2 |
| | 6/17/2016 | 1 |
| | 6/27/2016 | 2 |
| | 7/25/2016 | 1 |
| | 7/29/2016 | 2 |
| | 8/3/2016 | 1 |
| | 8/5/2016 | 2 |
| | 8/8/2016 | 1 |
| | 8/11/2016 | 1 |
| | 8/22/2016 | 2 |
| | 9/6/2016 | 1 |
| | 10/24/2016 | 1 |
| | 10/25/2016 | 1 |
| | 11/21/2016 | 2 |

| Customer | Date | Number of Trades |
|---|---|---|
| | 11/22/2016 | 1 |
| | 11/25/2016 | 4 |
| | 12/1/2016 | 1 |
| | 1/3/2017 | 5 |
| Customer 6 Roth IRA | 4/27/2016 | 2 |
| | 6/9/2016 | 2 |
| | 7/29/2016 | 1 |
| | 8/3/2016 | 2 |
| | 8/11/2016 | 1 |
| | 9/14/2016 | 1 |
| | 10/26/2016 | 2 |
| | 10/27/2016 | 2 |
| | 11/21/2016 | 1 |
| Customer 7 | 2/23/2017 | 1 |
| | 3/30/2017 | 2 |
| | 3/31/2017 | 2 |
| | 4/10/2017 | 1 |
| | 4/17/2017 | 1 |
| | 4/19/2017 | 1 |
| | 6/13/2017 | 1 |
| | 9/20/2017 | 2 |
| | 9/22/2017 | 2 |
| | 9/27/2017 | 3 |
| | 10/27/2017 | 1 |
| | 10/30/2017 | 3 |

## FIRST CLAIM FOR RELIEF
### Violations of Section 17(a) of the Securities Act

53.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 52, as if fully set forth herein.

54.     The Defendant, directly or indirectly, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, has: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or omissions of a material fact necessary in order to make the statement made, in light of the circumstances under which they

were made, not misleading; and/or (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities and upon other persons.

55.     While engaged in the conduct described above, the Defendant acted knowingly, recklessly, or negligently.

56.     By reason of the foregoing, the Defendant, directly or indirectly, has violated, and unless enjoined, will again violation Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

<u>**SECOND CLAIM FOR RELIEF**</u>
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder**

57.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 52, as if fully set forth herein.

58.     The Defendant, directly or indirectly, in connection with the purchase or sale of securities and by the use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, has: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

59.     While engaged in the conduct described above, the Defendant acted knowingly or recklessly.

60.     By reason of the foregoing, the Defendant, directly or indirectly, has violated, and unless enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

### I.

Finding the Defendant liable for the violations alleged herein;

### II.

Permanently enjoining the Defendant from committing, aiding and abetting or otherwise engaging in conduct that would make them liable for the violations of the federal securities laws alleged in this complaint.

### III.

Ordering the Defendant to disgorge any ill-gotten gains and to pay prejudgment interest on those amounts.

### IV.

Ordering the Defendant to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

### V.

Retaining jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered.

### VI.

Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by

jury in this action of all issues so triable.

Dated: September 7, 2018

Respectfully submitted,


By:     /s/ Gregory Bockin
        Gregory R. Bockin
        Samantha M. Williams
        Jacqueline M. O'Reilly
        S. Yael Berger
        U.S. Securities and Exchange Commission
        100 F. Street, N.E.
        Washington, D.C.  20549
        Phone:  (202) 551-5684 (Bockin)
        Email: bocking@sec.gov